UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

E.P. and L.H.,

Plaintiffs,

v.

JANKI MOTEL, INC.,

Defendant.

CIVIL ACTION FILE NO.:

______________________________

**JURY TRIAL DEMANDED**

**COMPLAINT**

1.

Plaintiffs are victims of sex trafficking at the AMERICA'S BEST VALUE INN located at 2574 CANDLER ROAD, DECATUR, GEORGIA 30032 (the "ABVI" or the "hotel" or the "property"). Given the nature of the case, Plaintiffs are identified in this Complaint by their initials. Plaintiffs' counsel will disclose Plaintiffs' full names to defense counsel as soon as they are known or as soon as an appropriate protective order is in place.

2.

From 2015-2016, E.P. was sold for sex at the hotel starting when she was a child of only sixteen years old.

3.

In November 2016, L.H. was sold for sex at the hotel starting when she was a

child of only seventeen years old.

4.

Defendant JANKI MOTEL, INC. was a Georgia Domestic Profit Corporation with its principal place of business at 1155 Morgan Garner Drive, Lilburn, Georgia 30047. Pursuant to O.C.G.A. § 14-4-161(b), service can be made on Defendant by serving its registered agent at the time that it was dissolved, Milan Patel, 1155 Morgan Garner Dr., Lilburn, GA 30047.

5.

Defendant has been properly served with process in this action.

6.

Jurisdiction and venue are proper as to Defendant.

7.

Defendant knew that sex trafficking and prostitution were rampant at the hotel for years—before, during, and after Plaintiffs' trafficking. Defendant knew because:

(a) Defendant knew about Plaintiffs while they were sold for sex at the hotel;

(b) Defendant's employees knew of and permitted sex trafficking and prostitution to occur at the hotel;

(c) Defendant knew about several other sex trafficking victims at the hotel before, during, and after Plaintiffs;

(d) Defendant knew about frequent and similar crimes occurring at the hotel;

(e) Defendant knew about the reports of hotel guests regarding sex trafficking and prostitution-related activities; and

(f) Defendant had knowledge of sex trafficking generally in the Atlanta area and at the hotel specifically.

8.

A person under the age of eighteen cannot consent to having sex in exchange for money. Any commercial sex involving a person under eighteen (i.e., "minor sex trafficking") is criminal sex trafficking under federal and Georgia law, regardless of whether the child had a trafficker/pimp or was subjected to "force, fraud, or coercion." 18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B). Every person who engages in commercial sex with a child is sex trafficking that child under § 1591(a)(1).

9.

Sex trafficking and prostitution were common occurrences at the ABVI and Defendant chose to ignore, allow, condone, facilitate, support, or permit such activity at the hotel. Defendant is liable to Plaintiffs for its actions and failure to act. Defendant's liability to Plaintiffs is straightforward:

(a) The Trafficking Victims Protection Reauthorization Act ("TVPRA") provides a cause of action to victims of sex trafficking

against "whoever knowingly benefits, financially or by receiving anything of value from participating in a venture which that person knew or should have known has engaged in an act in violation of the TVPRA." 18 U.S.C. § 1595(a). Defendant knowingly benefitted from participation in a venture that it knew or should have known engaged in an act in violation of the TVPRA. While operating the hotel, a common undertaking involving risk and potential profit, Defendant (i) rented rooms to Plaintiffs' respective traffickers so Plaintiffs could be violently sold for sex at the hotel, and (ii) did so despite what it knew or should have known about Plaintiffs being victims of sex trafficking at the hotel. As a result of Defendant's conduct, Plaintiffs suffered physical and mental harms, and Defendant is liable to Plaintiffs for the damages arising from those harms under the TVPRA.

(b) The ABVI constituted a public nuisance under Georgia law because the hotel negligently or recklessly turned a blind eye and permitted illegal activities to occur at the hotel, including rampant prostitution, sex trafficking, crimes against women, drugs, violence, and other dangerous illegal activity. As a direct result of this nuisance, Plaintiffs were sold for sex at the ABVI, causing them substantial harm.

(c) Because Plaintiffs were children when they were trafficked at the ABVI, and because Defendant knowingly facilitated their trafficking, Masha's Law, 18 U.S.C. § 2255, provides a civil remedy to Plaintiffs for the substantive violation of 18 U.S.C. § 1591.

10.

Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of its officers, directors, agents, employees, or representatives who were actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Defendant at the ABVI.

## I. E.P.'s trafficking at the America's Best Value Inn.

11.

In the spring of 2015 through the early months of 2016, when she was sixteen years old, E.P. was forcibly sold for sex at the ABVI.

12.

E.P. was trafficked at the ABVI, along with many other young girls who were also being sold for sex. During her time there, she and the other girls often appeared around the hotel in skimpy clothes to attract buyers.

13.

E.P. was sex trafficked on the backside of the ABVI property, where

Defendant intentionally placed sex trafficking victims to keep them out of public view. By intentionally placing E.P. in the rear of the hotel, Defendant concealed E.P.'s trafficker's operation and minimized his risk of detection.

14.

While E.P. was trafficked for sex at the ABVI, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, loitering, soliciting male patrons, and monitoring and control of E.P. by her trafficker.

15.

Defendant knew or should have known that E.P. was being trafficked based on these signs and behaviors.

16.

E.P. was sold for sex to roughly ten men per day while she was at the ABVI; thus, ten anonymous men visited the single room each day to purchase sex throughout the several months E.P. was trafficked at the ABVI. Defendant knew or should have known that the high number of older men visiting the room each day was clearly indicative of E.P.'s sex trafficking at the hotel.

17.

While a buyer was inside the room purchasing E.P. for sex, her trafficker

would leave the room and wait elsewhere on the property—walking around the hotel, sitting on the exterior steps, or sitting in his car. After the buyer left, the trafficker would return to the room to collect the money. This sequence repeated approximately ten times a day, every day E.P. was sold for sex at the ABVI.

18.

At times, E.P.'s trafficker forced her to walk the street to pick up dates. During these times, E.P. was dressed in revealing clothing. Her appearance made it clear she was being sold for sex. As she walked past the front office, E.P. repeatedly saw Employee 1 observing her.



19.

Employees at the ABVI accommodated and were familiar with E.P.'s trafficker.

20.

During her first stay at the ABVI, E.P. encountered Employee 1 who commented on her appearance. Later that evening, Employee 1 came to E.P.'s room after

first speaking with her trafficker. When Employee 1 knocked on the door, E.P.'s trafficker stepped outside, and E.P. was directed to have sex with Employee 1. E.P. did so.

21.

Housekeeping regularly entered the room where E.P. was being trafficked, emptied trash cans that contained used condoms, changed the bed sheets, and cleaned around underwear, bras, and other items left throughout the room. Defendant knew or should have known that these conditions, among others, were signs that E.P. was being sold for sex at the ABVI.

22.

On a regular basis, Defendant's employees knowingly removed and disposed of evidence of trafficking from the trafficker's room. This destruction of evidence was carried out in coordination with or for the benefit of the trafficker, with the effect of hindering any potential investigation into E.P.'s trafficking.

23.

When E.P. was trafficked at the ABVI, she saw many other girls and women who were obviously being sold for sex at the hotel. These women and children wore skimpy clothing throughout the hotel and parking lot, and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by

other anonymous men.

24.

Often, these women and children could be seen loitering around the hotel soliciting buyers of sex at the hotel. Defendant knew or should have known that these were signs of sex trafficking at its hotel.

25.

Defendant had a policy to allow and facilitate sex trafficking at the ABVI including the sex trafficking of E.P. Defendant enacted that policy by, among other things, agreeing to house E.P.'s trafficker and his trafficking ventures, his associates, and victims. Defendant knowingly placed E.P. on the backside of the hotel, concealing her sex trafficking and protecting her trafficker from detection. And Defendant knowingly and actively disposed of and destroyed physical evidence of E.P.'s sex trafficking for her trafficker, protecting him from potential investigation by the police.

**II. L.H.'s trafficking at the America's Best Value Inn.**

26.

On November 26 and 27, 2016, when she was just seventeen years old, L.H. was forcibly sold for child sex at the ABVI.

27.

L.H. was specifically taken to the ABVI because her trafficker knew that the

minor sex trafficking business was booming there.

28.

When L.H. and her trafficker arrived at the ABVI, her trafficker rented room 222 from Defendant and paid Defendant for the room. While her trafficker checked in, L.H. waited outside on the stairs with her few belongings in a trash bag. From the front office, the front desk employee could see seventeen-year-old L.H. waiting outside.

29.

L.H. was sold for child sex on the backside of the ABVI in room 222, where Defendant intentionally placed sex trafficking victims to keep them out of public view. By intentionally placing L.H. in the rear of the hotel, Defendant concealed L.H.'s trafficker's operation and minimized his risk of detection.

30.

While at the ABVI, L.H. was sold for child sex to at least two buyers of sex.

31.

While L.H. was trafficked for sex at the ABVI, she exhibited numerous well-known and visible signs of a sex trafficking victim, of which Defendant knew or should have known, including her young age and inappropriate appearance, fatigue, sleep deprivation, injuries, a failure to make eye contact with others, loitering, soliciting male patrons, and monitoring and control of L.H. by her trafficker.

32.

Defendant knew or should have known that L.H. was being trafficked based on these signs and behaviors.

33.

L.H.'s trafficker forced her to walk the street to pick up dates. During these times, L.H. was dressed in revealing clothing. Her appearance made it clear she was being sold for sex. As she walked past the front office, L.H. repeatedly saw the front desk employee observing her.



34.

Employees at the ABVI accommodated and were familiar with L.H.'s trafficker.

35.

On November 27, 2016, a hotel employee called L.H.'s room for payment for that night's stay. L.H. could not pay. A hotel employee came to the room and forced her to leave. Seventeen-year-old L.H. then sat outside on the hotel balcony with her

belongings and nowhere to go.

36.

While L.H. was sitting outside, a pimp staying in a nearby room approached her and invited her into his room. The man appeared to be living at the ABVI, and his room contained bins, boxes, hot plates, clothing, and other belongings. A woman whom he was selling for sex was also staying in the room.

37.

The pimp attempted to recruit seventeen-year-old L.H. to work for him. Shortly thereafter, the same hotel employee who had just removed L.H. from room 222 came to the pimp's room.

38.

The hotel employee's demeanor made clear that he knew the pimp well. When the employee saw L.H. inside the room, he initially told her that she had to leave. The pimp intervened and told the employee that L.H. was with him and that she was "fine." The employee accepted the pimp's explanation and left L.H., a seventeen-year-old girl whom he had just removed from another room because she could not pay, with the known pimp without further question.

39.

When L.H. was trafficked at the ABVI, she saw many other girls and women who were obviously being sold for sex at the hotel. These women and children wore

skimpy clothing throughout the hotel and parking lot, and there was a constant stream of traffic throughout the day of men with no luggage visiting the hotel rooms of these women and children for short periods of time before leaving and being followed by other anonymous men.

40.

Often, these women and children could be seen loitering around the hotel soliciting buyers of sex at the hotel. Defendant knew or should have known that these were signs of sex trafficking at its hotel.

41.

Defendant had a policy to allow and facilitate sex trafficking at the ABVI including the sex trafficking of L.H. Defendant enacted that policy by, among other things, agreeing to house L.H.'s trafficker and his trafficking ventures, his associates, and victims. Defendant knowingly placed L.H. on the backside of the hotel, concealing her sex trafficking and protecting her trafficker from detection.

42.

A few days after her trafficking at the ABVI, L.H. was rescued by police, and her trafficker was convicted of trafficking L.H. for sex.

## III. Defendant's Involvement with Other Trafficking Victims at the ABVI

43.

Before, during, and after Plaintiffs' child sex trafficking at the ABVI,

prostitution, sex trafficking, and child sex trafficking were rampant and frequent occurrences at the hotel and were obvious to employees and guests.

44.

The ABVI had a well-established reputation for criminal activity, including prostitution and sex trafficking.

45.

Defendant had a policy not to call the police regarding known sex trafficking at the hotel.

46.

Beginning in 2009, another child, C.L., was trafficked for sex at the ABVI beginning when she was just seventeen years old.

47.

C.L. reports that while she was being sex trafficked at the ABVI, Employee 1 repeatedly purchased her for sex. Specifically, Employee 1 would exchange sex with her to cover the cost of her room.

48.

Employee 1 began following this victim around the ABVI property. He would appear uninvited in her room and point to his genitals, a sign that he expected sex.

49.

Once, C.L. and her trafficker were sitting in his truck in the parking lot of the

ABVI when an argument broke out between them. During the altercation, C.L. jumped out of the vehicle and ran into the front office. C.L.'s trafficker followed her inside and forcefully placed his arm around her in an effort to regain control and force C.L. back to the truck. C.L. was yelling and pleading for the employee to call the police. The employee refused to do so. C.L.'s trafficker then escorted C.L. back to the truck and forced her inside.

50.

Beginning in 2014, another child, K.W., was trafficked for sex at the ABVI when she was just sixteen years old.

51.

K.W. reports that while she was being sex trafficked at the ABVI, she was kept in a room on the backside of the hotel with two other girls who were also being sold for sex. Defendant intentionally placed sex trafficking victims to keep them out of public view.

52.

K.W. was sold for sex approximately five times per day while at the ABVI. During that time, she had to walk past the ABVI's glass front office to escort buyers back to her room for sex.

53.

While she was being sold for sex at the ABVI, K.W.'s trafficker would punch

and choke her if she resisted seeing buyers or posting advertisements for sex online. This occurred daily.

54.

Once, K.W. was forced to perform a sex act inside a semi-truck parked at the front of the hotel while her trafficker stood by the lobby and watched.

55.

Beginning in 2014, another child, T.O., was trafficked for sex at the ABVI when she was just sixteen years old.

56.

T.O. reports that while she was being sex trafficked at the ABVI, she was kept in one room with two other children who were also being sold for sex. At the time, T.O. was five months pregnant.

57.

T.O. saw six to nine buyers per day. The other two victims saw a combined seventeen to nineteen buyers per day. Thus, a conservative total of more than twenty men per day were visiting a room housing three children.

58.

The same pattern repeated continuously: a buyer would walk up the stairs, the traffickers would step out of the room, the buyer would leave, and the trafficker would return. This scene played on a loop as many as thirty times per day in full

view of the hotel's cameras.

59.

T.O. was forced to walk in front of the glass office wearing bras, underwear, and other revealing clothing. Adult men saw her and followed her back to her hotel room, walking right past the glass front office on their way.

60.

The hotel staff was familiar with T.O.'s traffickers. T.O. overheard her trafficker speak with a front desk employee about payment for a room, stating he would settle the bill later, after the girls made some money. The employee agreed.

61.

When the police drove by the property, the front desk employee called T.O.'s trafficker personally to warn him.

62.

Housekeeping entered the room each day. The trash can was full of condoms, wipes, and drug paraphernalia. If housekeeping came into the room right after a date, T.O. and the other minor sex trafficking victims would be half-naked or wrapped in nothing but a towel.

63.

T.O.'s trafficker was arrested and pled guilty to sex trafficking and pimping a person under eighteen—crimes he committed at the ABVI.

64.

Beginning in 2014, another child, S.D., was trafficked for sex at the ABVI when she was just thirteen years old.

65.

S.D. was kept on the second floor of the backside of the hotel. Defendant intentionally placed sex trafficking victims to keep them out of public view.

66.

To attract buyers, S.D.'s trafficker would make the child stand in front of the window naked or half-dressed to attract men driving through the parking lot. She was also forced to walk past the glass front office on her way to her room.

67.

When a buyer arrived, S.D.'s trafficker would go to another room at the hotel and return immediately after the buyer left. This occurred more than ten times per day. The hotel's cameras covered every angle of the property, meaning the Defendant could see this same sequence repeating itself all day long.

68.

When S.D.'s trafficker was away, S.D. met dates in the lobby of the hotel. S.D.'s trafficker would call the hotel room to let S.D. know a buyer was on the way. Front desk staff observed her walking into the lobby, meeting the date, walking from the lobby back to the room, and back again throughout the day. Further, front desk

staff tracked how many dates S.D. had and communicated that information to her trafficker by phone.

69.

When law enforcement came to the ABVI specifically searching for S.D., a front desk employee falsely told officers S.D. was not at the hotel and alerted her trafficker that the police were looking for her.

70.

Employee 1 purchased the thirteen-year-old child for sex approximately five times.

71.

Housekeeping came to S.D.'s room every other day to empty the trash and deliver fresh towels. The trash contained gold condom wrappers piled to the top, along with sanitary wipes. At all times, S.D.'s room contained an arrangement of hand sanitizer, lubricant, and condoms.

72.

On one occasion, after S.D. was horrifically sodomized by a buyer, her trafficker called housekeeping to the room. Housekeeping entered, changed the bloody sheets, provided S.D. with new towels, and left.

73.

Beginning in 2013, another child, C.W., was trafficked for sex at the ABVI

when she was just fourteen years old.

74.

During the entirety of her stay, C.W. lived in a room with another girl who was being sold for sex as well as their trafficker.

75.

C.W. was purchased for sex between fifteen and twenty times daily. When a date arrived, C.W.'s trafficker would stand outside her room collecting money from buyers before they went in to select which child they would buy for sex.

76.

Buyers would walk up the stairs, hand money to the trafficker on the open balcony, enter the room, and select which girl they wanted. This pattern repeated itself more than twenty times each day, in full view of the cameras covering the balconies, stairs, and parking lot.

77.

C.W. observed Employee 1 come to the room to purchase sex at least two times per week. Each time, he followed the same routine: he walked up the stairs, handed money to the trafficker, and entered the room. He consistently selected the same child to have sex with. This child told C.W. he was a regular.

78.

Another victim, A.D., whose declaration is attached to this Complaint[1], was also trafficked at Defendant's hotel for several years. Beginning in 2013, A.D. lived on the property for more than a year and continued to return for extended stays lasting several months at a time until about 2015. During this period, A.D. was sold for sex to approximately five to ten men per day while staying at the hotel.

79.

A.D. stated that Employee 1 was fully aware of the sex trafficking and prostitution activity occurring at the hotel. Employee 1 frequently asked her detailed questions about the prostitution and sex trafficking at the hotel, including what types of men were purchasing sex, how many sex buyers she saw each day, and how much money she was making.

80.

The hotel intentionally segregated guests based on their involvement in sex trafficking and prostitution. According to A.D., Employee 1 told her that because she was "selling sex," he wanted to move her to a room at the back of the building—and he did so. A.D. explained that the front of the hotel was reserved for so-called "regular" guests, while individuals being sold for sex were intentionally placed in the

[1] *See* Ex. 1, A.D. Declaration.

back. Defendant knew or should have known of its policy and practice to conceal sex trafficking from public view by housing sex trafficking victims at the back of the property, thereby allowing sex trafficking to operate without disruption.

81.

On nights when A.D. did not see any buyers, Employee 1 would approach her and comment on it, saying things like, "You didn't have company last night?"—a clear reference to men coming to the hotel to purchase A.D. for sex.

82.

When A.D. was unable to pay for a room, Employee 1 would inquire about when A.D. was expecting her next "company," a clear reference to sex buyers. The hotel permitted A.D. to remain in the room without payment, knowingly advancing the cost of the room in anticipation that it would be repaid with proceeds from her trafficking. Defendant knew or should have known of its policy and practice of advancing room credit in exchange for proceeds from sex trafficking.

83.

On one occasion in 2013, A.D. was violently robbed in her room by two men and a woman who physically assaulted her and stole her belongings. A.D. fled the room in her underwear, visibly beaten and bruised, and ran into the hotel office to seek help. Employee 1 reviewed the surveillance footage and still refused to contact the police. Instead, he instructed A.D. to return to her room.

84.

Police officers would occasionally drive through and park on the edge of the property. When this occurred, Employee 1 would approach the patrol vehicles and demand that officers leave the property, refusing to allow them to monitor the premises. Defendant knew or should have known of its policy and practice of keeping law enforcement off the ABVI property to prevent interference with the ongoing sex trafficking taking place at the hotel.

85.

A.D. saw ten or more other people being sold for sex at the same time at the ABVI. They would walk the property to pick up dates.

86.

A.D. estimates that there were at least fifty to one hundred men who came to the ABVI each day to purchase sex. The sex buyers would honk their horns upon arrival, prompting girls to come out of their rooms dressed in skimpy clothing so the buyer could pick out which girl he wanted to buy for sex. A.D. described the scene as being "like a drive-through sex operation."

87.

Beginning in 2015, Lieutenant C.D. King became familiar with the ABVI through his investigation of prostitution and sex-trafficking crimes in the area. The ABVI was a known hotspot for drug crimes and commercial sex. According to Lt.

King, as many as twenty women or girls were engaged in commercial sex at the property.

88.

The commercial-sex activity at the ABVI was open and obvious. According to Lt. King, the signs were apparent to anyone working at the hotel.

89.

Law enforcement offered to meet with hotel ownership and provide training on identifying suspicious activity and when to contact police. Defendant never requested that training. Defendant also could have hired off-duty police officers to provide security at the ABVI but never did so.

90.

Officer Demetrius Richardson similarly became familiar with the ABVI while patrolling and investigating incidents in and around the property from 2013 through 2021. He identified the ABVI as a problem property known for prostitution, sex trafficking, and drug activity.

91.

According to Officer Richardson, the level of criminal activity at the ABVI was impossible for hotel management to miss. The property was small, management had surveillance cameras, and management could observe men repeatedly coming and going from rooms where girls were being sold for sex.

92.

Both Lt. King and Officer Richardson concluded from their observations of the ABVI that Defendant permitted criminal activity to continue because it wanted to continue renting rooms to the individuals engaging in it.

93.

Defendant owned, operated, managed, franchised, or otherwise controlled the ABVI and employed or controlled employees there, giving them specific and direct knowledge of prior and ongoing crime, including prostitution and sex trafficking occurring at the hotel during that period.

## IV. Defendant's knowledge of crime at the America's Best Value Inn.

94.

Defendant provided a market and beds for sex traffickers to sell victims to buyers of commercial sex. That is why Plaintiffs' respective traffickers brought them to the ABVI to be sold for child sex.

95.

Defendant had actual or constructive knowledge of the ABVI's publicly available online reviews that reported prostitution and crime at the hotel, including the following (reproduced verbatim):

(1) <u>July 2012, from priceline.com:</u>

> "The hotel reminds me of a dirty motel that rents room by the hour!"

(2) September 2013, from priceline.com:

"The surrounding area . . . was undesirable, lots of people walking the streets at all times."

(3) July 21, 2014, from expedia.com:

". . . they were **selling drugs there and prostitution** Going on there."

(4) August 2015, from tripadvisor.com:

"**Drug and prostitution ring**

When we got back to the motel after dinner a police officer outside informed us of the **drug and prostitution issue** the motel was having . . ."

(5) January 2016, from tripadvisor.com:

"I know this has to be a place that rents rooms out to a lot of **drug abusers and prostitutes**."

(6) September 2016, from tripadvisor.com:

"I immediately began being harassed by men hanging out in the parking lot. This happened any time I left the room . . . I even had one man flash a few fifties at me and try to "buy" me, and one that followed me from the stairs to the front office."

(7) January 2017, from tripadvisor.com:

"This place didn't feel safe at all it look like, **it is prostitute infested drug-infested**."

96.

Defendant knew or should have known of these and other customer reports showing the dangerous nuisance of the property and the rampant crime that occurred

on the premises.

97.

In addition to all the above, the police frequently investigated and made arrests for substantially similar instances of criminal activity at the ABVI. Much of this activity either alerted or should have alerted Defendant to the hotel's rampant sex trafficking, prostitution, and sex crime problem.

As mere examples, among many other instances, the police responded to the following incidents at the hotel before, during, and after Plaintiffs' trafficking:

(1) On **June 29, 2009**, a female reported that she was **sexually assaulted** at the ABVI.

(2) On **May 12, 2011**, a male victim reported being set up for a paid sex encounter at the ABVI, then assaulted and robbed by two unknown men after refusing to pay.

(3) On **October 23, 2011**, a victim reported being **sexually assaulted** at the ABVI.

(4) On **June 4, 2012**, a female reported being slapped and choked by a male suspect at the ABVI after refusing to "do anything" with him.

(5) On **February 25, 2014**, a male victim reported that a woman he met on the dating site Plenty of Fish—a website commonly used to arrange

paid sex—stole his wallet, phone, pants, and keys after spending the night with him at the ABVI.

(6) On **June 19, 2014**, DeKalb County Police Department's Vice Unit conducted a police operation targeting females that engaged in prostitution and arrested a female for **prostitution**.

(7) On **November 4, 2015**, a woman was issued a criminal trespass warning after she kicked a hotel room door at the ABVI during a dispute over a $20.00 **sex-for-money arrangement** that was not honored.

(8) On **November 28, 2015**, a woman reported being assaulted at the ABVI by a man who became angry when she refused to have sex with him.

(9) On **May 20, 2017**, a man reported being assaulted at the ABVI after a **sex-for-money arrangement** turned violent, resulting in mutual combat in the hotel lobby.

(10) On **February 4, 2017**, a man reported being robbed at knifepoint at the ABVI after letting in a woman he hoped was a prostitute, who later returned with two men.

(11) On **July 2, 2017**, a woman reported being beaten, strangled, and nearly sexually assaulted by a man in room 214 of the ABVI.

(12) On **November 7, 2017**, DeKalb County Police Department's Vice Unit

conducted an operation and arrested a female for **prostitution**.

(13) On the same day, **November 7, 2017**, an undercover officer arrested a woman for **prostitution** after she solicited sex from him at the ABVI.

(14) On **November 11, 2017**, DeKalb County Police Department Vice Unit conducted a prostitution operation at the ABVI and arrested a female for prostitution and keeping a place for prostitution.

(15) On **February 4, 2018**, a man reported being robbed at gunpoint at the ABVI after arranging to meet a woman on the dating site Plenty of Fish—a website commonly used to arrange paid sex—who lured him into a setup.

98.

This type of prior reported police activity all caused or should have caused Defendant to recognize that the hotel was frequently being used for the purposes of sex trafficking.

99.

Defendant and its employees knew or should have known that obvious sex trafficking, including Plaintiffs' sex trafficking, was occurring at its property, at times with the assistance of its employees.

**V. Defendant's knowledge of sex trafficking generally.**

100.

Defendant knew or should have known of the existence of sex trafficking and its illegality more than twenty years ago, since the passage of the Victims of Trafficking and Violence Protection Act of 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

101.

Defendant knew or should have known that during the relevant period Atlanta was a national hub of sex trafficking and that the crime was prevalent in the city, including at the ABVI. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta has one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.00. Over the last two decades, sex trafficking has generated billions of dollars in illicit profits in metro Atlanta alone. Defendant received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiffs.

102.

Defendant knew or should have known of the Atlanta area's well-publicized

reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[2] and as "the number one city for child sex trafficking."[3]

103.

Defendant knew or should have known that motels and hotels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat of violence from their procurers." *City of Los Angeles v. Patel*, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J., and Thomas, J.).

104.

Defendant knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received and obtained information on involving motels and hotels were sex trafficking cases, and another 2.6 percent reported a combination of sex and labor trafficking.[4] A 2012

---

[2] Sally Yates, *Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month* (Jan. 29, 2015), https://www.justice.gov/archives/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited September 10, 2026).

[3] *Id.*

[4] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://respect.international/wp-content/uploads/2020/11/National-Hotline-Cases-Occurring-in-Hotels-and-Motels-.pdf (last visited September 10, 2026).

study found that 63 percent of trafficking incidents occurred in motels.[5] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with motels at some point" during their exploitation.[6] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from motel staff."[7]

105.

Defendant knew or should have known that attorneys for the motel industry estimated and reported to motel industry representatives that eight out of ten human trafficking arrests occur in and around motels,[8] and that the industry had been warned, among other things, to "Make sure motel not complicit," "Manager not looking the other way," and "No pay off for silence or lack of curiosity."[9]

---

[5] Jon Conte et al., *Business Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), https://web.archive.org/web/20210511135432/https.www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf.

[6] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited September 10, 2026).

[7] *Id.* at 23.

[8] Rich Keating, *Human Trafficking: What Is It and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), https://perma.cc/X5DG-YQ3M.

[9] *Id.* at 19.

106.

Defendant knew or should have known that the organization called End Child Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code") in the United States in 2004.[10]

107.

Defendant knew or should have known that the Code, which lays out well-established best practices for the hospitality industry to identify, address, and deter sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a) establish corporate policy and procedures against sexual exploitation of children;

(b) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e) support, collaborate and engage stakeholders in the prevention of sexual

[10] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited September 10, 2026).

exploitation of children; and

(f) report annually on the company's implementation of Code-related activities.

108.

Defendant knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

109.

Defendant knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and motels detect and respond to human trafficking. DHS's guidelines instruct housekeeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a) persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b) persons who lack freedom of movement or are constantly monitored;

(c) persons who have no control over or possession of money or ID;

(d) persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e) requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f) the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g) extended stay with few or no personal possessions in the room;

(h) excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i) the same person reserves multiple rooms;

(j) a room is rented hourly, less than a day, or for an atypical extended stay;

(k) attempts to sell items to or beg from patrons or staff;

(l) cars in the parking lot regularly parked backward, so the license plates are not visible;

(m) loitering and solicitation of male patrons;

(n) waiting at a table or bar and picked up by a male (trafficker or customer);

(o) persons asking staff or patrons for food or money; and

(p) persons taking cash or receipts left on tables.

110.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiffs' cases, the ABVI, for a fee, provided this market for Plaintiffs to be confined and sold.

**COUNT I**
**STATUTORY LIABILITY: SEX TRAFFICKING**
**18 U.S.C. § 1595**

111.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

112.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendant knowingly benefitted from participation in a venture that Defendant knew or should have known engaged in acts in violation of the TVPRA.

113.

Defendant knowingly benefitted from Plaintiffs' sex trafficking by receiving revenue generated by the operation of the ABVI, including the revenue generated for the rooms in which Plaintiffs were trafficked. Each day Plaintiffs were trafficked at the ABVI, Defendant knowingly benefitted by receiving money from Plaintiffs' trafficking in the form of room-rental fees.

114.

Defendant participated in a hotel venture and knew or should have known that its operation, ownership, management, franchising, or control of the ABVI violated the TVPRA by harboring and falsely imprisoning Plaintiffs so that they could be sold for sex at the hotel. Defendant also participated in a venture by actively

cooperating with, accepting bribes from, serving as a lookout for, and allowing Plaintiffs' sex trafficker(s) to harbor, falsely imprison, and traffic Plaintiffs at the ABVI.

115.

The venture in which Defendant participated was in or affecting interstate commerce.

116.

Defendant knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives participated in Plaintiffs' child sex trafficking at the ABVI. Defendant knew or should have known of this participation.

117.

Defendant also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendant's agents, employees, and representatives knew or should have known of other sex trafficking and illegal criminal activity occurring at the ABVI.

118.

Defendant is directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of its agents and representatives.

119.

Plaintiffs have suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendant's participation in this venture.

120.

Defendant is liable to Plaintiffs for their damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

121.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiffs for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT II**
**STATUTORY LIABILITY: MASHA'S LAW, 18 U.S.C. § 2255**

122.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

123.

Plaintiffs were under the age of eighteen when they were trafficked at the ABVI.

124.

Plaintiffs were victims of violations of 18 U.S.C. § 1591 at the ABVI.

125.

As described herein and specifically in paragraphs 11-25, and 26-42, Defendant knowingly benefitted from participating in a venture that it knew or should have known engaged in an act of sex trafficking at the ABVI, including the harboring and other trafficking activities which harmed Plaintiffs.

126.

Plaintiffs suffered injuries as a result of Defendant's violations of 18 U.S.C. § 1591 and 18 U.S.C. § 2255.

127.

Thus, as described herein, Defendant is jointly and severally liable to Plaintiffs for compensatory and punitive damages, in an amount to be determined at trial.

**COUNT III**
**NUISANCE**

128.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

129.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, inconvenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

130.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

131.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual. However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

132.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

**Public Nuisance**

133.

The ABVI's history of rampant crime and illegal sex activity created a spill-over effect that led to other crime occurring in the surrounding area.

134.

The ABVI caused or contributed to a blighting effect on the surrounding community, so that the ABVI negatively damaged all persons who came within the sphere of operation of the crime, sex trafficking, and prostitution at the ABVI, although the effects on each person may have varied.

135.

The illegal prostitution and sex trafficking nuisance occurring at the ABVI had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraging idleness, loitering, vagrancy, and tending to breed crime and debauch the morals of the community.

136.

The acts and omissions of Defendant in permitting prostitution and sex trafficking at the ABVI caused special damages to Plaintiffs, as they were victims of child sex trafficking at Defendant's nuisance hotel and suffered damages to their health, including mental and emotional harm, pain and suffering, and Defendant is liable to Plaintiffs for all such damages.

**Public Nuisance Per Se**

137.

The ABVI constituted a statutory nuisance per se under Georgia law because Defendant knowingly and/or negligently turned a blind eye and permitted illegal sexually related crimes to occur at the ABVI, including sex trafficking.

138.

A business where illegal practices are permitted constitutes a nuisance.

139.

A business, like the ABVI, that allows prostitution and sex trafficking is a per se public nuisance under Georgia law. *Brindle v. Copeland*, 145 Ga. 398, 89 S.E. 332 (1916) ("A lewd house is per se a 'public nuisance.'").

140.

Plaintiffs were directly harmed as a result of the sex crime nuisance at the ABVI that permitted illegal sexual activity to occur there.

141.

Defendant is liable for nuisance (public nuisance and/or per se public nuisance) by reason of its failure to remedy the dangerous condition of prostitution and sex trafficking that persisted over a period of time as a continuous and repetitious condition and of which Defendant had express notice and knowledge, and whereby Plaintiffs were direct victims of such activity.

## DAMAGES

142.

Plaintiffs incorporate the paragraphs above as if fully restated herein.

143.

As a proximate and foreseeable result of Defendant's violations of the TVPRA and Georgia law, Plaintiffs sustained physical injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiffs bring each and every claim permissible under Georgia and federal law against Defendant for injuries suffered in the incident at issue, and to recover for all economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, actual, general, and punitive damages permissible under Georgia and federal law. Plaintiffs seek all compensatory, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a) Physical injuries;

(b) Past, present, and future conscious pain and suffering;

(c) Loss of enjoyment of life;

(d) Mental anguish and emotional distress;

(e) Incidental expenses;

(f) All compensatory, economic, punitive, and other damages

permissible under Georgia and federal law; and

(g) Consequential damages to be proven at trial.

144.

Plaintiffs are entitled to an award of punitive damages without limitation or cap because the actions of Defendant and its employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

145.

Defendant's actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiffs undue expense. Thus, Plaintiffs are entitled to recover their necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68, and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiffs are entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiffs pray for a judgment to be awarded to them and against Defendant for the following:

(a) Process issue as provided by law;

(b) Plaintiffs be awarded actual damages in amounts to be shown at trial from Defendant;

(c) Plaintiffs be awarded all general, special, compensatory, economic, consequential, punitive, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

(d) Plaintiffs be awarded a trial by jury; and

(e) Plaintiffs have such other relief as this Court deems just and appropriate under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on September 23, 2026.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
CAROLINE M. CAPPS
Georgia Bar No. 645599
ccapps@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone

(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

ANDERSEN, TATE & CARR, P.C.

*/s/ Jennifer M. Webster*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com
CAROLINE M. CAPPS
Georgia Bar No. 645599
ccapps@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile